**Lolita SCHAR, Plaintiff,**

v.

**HARTFORD LIFE INSURANCE CO., Defendant.**

**No. C 02–1073 JL.**

United States District Court,
N.D. California.

Jan. 23, 2003.

---

James J. Matson, Law Offices of James J. Matson, Walnut Creek, CA, for Plaintiff.

Bruce D. Celebrezze, Sedgwick Detert Moran & Arnold, San Francisco, CA, for Defendant.

## SUMMARY JUDGMENT

LARSON, United States Magistrate Judge.

### INTRODUCTION

Defendant's Motion for Summary Judgment came on for hearing on November 20, 2002. Appearing for Plaintiff was James J. Matson. Appearing for Defendant was Dean J. McElroy. The court finds that the parties dispute the cause of death of Robert Schar, the decedent under the accidental death insurance policy at issue in this case. However, the fact in dispute is not material because none of the possible causes constitutes an accident under California law and, therefore, there is no coverage. Since there is no contractual obligation on the part of Defendant, Plaintiff's cause of action for breach of contract must fail. It logically follows then that her cause of action for breach of the covenant of good faith and fair dealing also fails. The matter having been fully considered and good cause appearing, it is hereby ordered that the motion is granted for the Defendant.

### FACTUAL BACKGROUND

#### The Accidental Death Policy

Plaintiff's husband, Mr. Robert Schar, purchased an Accidental Death and Dismemberment Certificate of Insurance effective November 1, 1995 from Hartford, designating his wife, Lolita Schar, as the beneficiary. The maximum benefit was $150,000. The policy provides:

If a Covered Person's injury results in any of the following losses within 365 days after the date of accident, we will pay the sum shown opposite the loss.

For Loss of:

"Life . . . . . The Principal Sum" (Defense Exhibit, hereinafter "D.E." A pg. 19).

The Policy defines "injury:"

Injury means bodily injury resulting directly from accident and independently of all other causes which occurs while the Covered Person is covered under this policy. The policy excludes from coverage a loss resulting from:

"a) sickness or disease, except a pus-forming infection which occurs through an accidental wound; or

b) medical or surgical treatment of a sickness or disease; is not considered as resulting from injury." (D.E.A, pg.13).

#### The Death of Robert Schar

The parties dispute the cause of death of Mr. Schar. Plaintiff contends it was probably an embolism resulting from surgery. Defendant believes it was ultimately from either atrial fibrillation or the arthritis which led to his surgery which in turn led to the embolism.[1]

According to a history and physical examination conducted on March 4, 1997, about eight months before his death, Mr. Schar was hypertensive; and an echocardiogram revealed left ventricular dilation, hypertrophy and significant hypocontractility. In short, he had high blood pressure and significant heart disease. Mr. Schar's medical records further disclose that he had osteoarthritis of the right knee, which required a total knee replacement.

Mr. Schar, the 63 year old vice-president of a nutritional supplement company, had total knee replacement surgery performed

---

1. No one contends that arthritis was a proximate cause of death.

by John M. Knight, M.D., an orthopedic surgeon, on October 16, 1997. Dr. Knight's pre-op order, dated October 8, 1997, notes that the patient had atrial fibrillation and hypertensive irregular rhythm, as well as severe arthritis of the right knee. Dr. Knight's discharge notes indicate that the patient did well post-op and was stable upon discharge from the hospital on October 22. Ex. 2 to (Knight Deposition, at Ex. 5 to McElroy Declaration). He saw Mr. Schar for a follow-up examination in his office on October 27. Mr. Schar was generally doing well, despite some swelling of the knee. Dr. Knight felt that was to be expected in a patient who was on anti-coagulants. (Knight at 9:18–22) Dr. Knight is an experienced orthopedic surgeon, with a special interest in sports medicine.[2]

Two days later, Mr. Schar was at home sitting in a chair reading a book when he suddenly collapsed. His family called 911 and cardiopulmonary resuscitation ("CPR") was started at the scene. When the Fire Department personnel arrived, Mr. Schar was in asystole.[3] He was pronounced dead on October, 28, 1997 at 1:38 p.m. According to the Emergency Room Report, Mr. Schar "had a history of car-

diomyopathy[4] with chronic atrial fibrillation."[5] The Report lists the assessment as "cardio-pulmonary arrest[6] of uncertain etiology[7], status post-surgery." The report also states that he was taking the following medications: Vasotec[8], Norvasc[9], Coumadin,[10] and Lanoxin.[11] This court took judicial notice of the indications for these medications as described in the *Physician's Desk Reference*, 56th ed. (2002), in excerpts filed as Exhibits A through D to Defendant's Request for Judicial Notice.

Mr. Schar's Certificate of Death (Ex. A to McElroy Declaration, also at Ex. 3 to Knight Deposition at Ex. B to McElroy Declaration) was signed on October 29, 1997 by John M. Knight, M.D., the same doctor who performed the knee replacement. The immediate cause of death was listed as cardiac arrest due to atrial fibrillation. The doctor listed, "[o]ther significant conditions contributing to death but not related to cause given [above] as 'Osteoarthritis right knee, total knee replacement.' "

Dr. Knight later became convinced that pulmonary embolism was the cause of death, rather than atrial fibrillation alone. "I still believe that a pulmonary embolism

2. Curriculum Vitae at Ex. 1 to (Knight Deposition, Ex. B to McElroy Declaration).

3. The absence of heartbeat.

4. Disease of the middle area of the heart.

5. In which the normal rhythmical contractions of the cardiac atria are replaced by rapid irregular twitching of the muscular wall.

6. No heartbeat, no breathing.

7. Cause.

8. Also known as enalaprilmaleate, indicated for the treatment of hypertension, heart failure, asymptomatic left ventricular dysfunction, which may be used alone or in combination with other antihypertensive agents.

9. Also known as amlodipine besylate, indicated for the treatment of hypertension, which may be used alone or in combination with other antihypertensive agents. Also indicated for Chronic Stable Angina (severe constricting pain referring to pectoris) and Vasospastic Angina (contraction or hypertonia of the muscular coats of the blood vessels).

10. Also known as crystalline warfarin sodium, indicated for the prevention or treatment of venous thrombosis (clotting of the blood) and pulmonary embolism (obstruction of a blood vessel by a clot).

11. Also known as digoxin, indicated for heart failure, atrial fibrillation, and atrial flutter, rapid regular atrial contractions occurring at rates between 250 and 350 per minute.

was far more likely than the atrial fibrillation alone to be the cause [of] his death." (Letter to attorney Thomas Schofield, Ex. 6 to Knight Deposition, Ex. B to McElroy Declaration). The original conclusion was based on incomplete information, because Mrs. Schar was emotionally unprepared to have an autopsy performed. (Dr. Knight's Deposition, hereinafter "Knight" 11:11–15, 12:6–8, 10:16–17). Without an autopsy Dr. Knight felt he could not conclusively determine Mr. Schar's exact cause of death. (Knight 1–:2–25). However, in his opinion the patient ultimately died as a result of cardiac arrest. (Knight 10:20–25). In hindsight, Dr. Knight testified that atrial fibrillation should have been included in the diagnosis. (Knight 11:1–4).

In addition to not being able to state conclusively the exact cause of Mr. Schar's cardiac arrest, Dr. Knight was unfamiliar with the death certificate process. In fact, this was the first time he had completed a death certificate, probably since his residency training 19 years before. (Knight 12:9–22). As an orthopedic surgeon, he does not deal routinely with atrial fibrillation. (Knight 20: 23–25). However, it is within his expertise to render opinions about embolisms that develop after joint surgery. (Knight 18:3–26, 19:1).

After signing the death certificate, Dr. Knight consulted at least one and possibly two cardiologists to increase his understanding of the effects and consequences of atrial fibrillation. (Knight 20:23–26, 21: 5–7, 21:17–26, 22:1–10). Based on the information he obtained, Dr. Knight believed Mr. Schar's death was more likely caused by "a fatal pulmonary embolism resulting from postoperative complications of his total knee replacement." (Knight 39: 13–22).

Nine months after Mr. Schar's death, Hartford Life Insurance Company (hereinafter "Hartford" or "Defendant.") requested a "Proof of Death–Attending Physi-

cian's Statement" from Dr. Knight. (Ex. 5 to Knight Deposition, Ex. B to McElroy Declaration). On July 24, 1998, Dr. Knight indicated at that time that the primary cause of death was "presumed cardiac arrest" and the secondary or contributory cause "pulmonary embolism." The statement also included atrial fibrillation as a possible contributing factor to Mr. Schar's death. (Id.).

## PROCEDURAL BACKGROUND

After her husband's death, Plaintiff submitted a claim to Hartford and received two denial letters. In the first, Hartford invoked the exclusion from coverage of loss resulting from sickness or disease, concluding that Mr. Schar died from cardiac arrest due to atrial fibrillation. (Decl of James A. Sherman, Ex. B at pages HFC016–HFC017). In that letter Hartford's claims supervisor also contended that the case law cited by Plaintiff's attorney that post-operative embolism constituted an "accident" under the policy was inapplicable, since Hartford was applying the sickness and disease exclusion, relying on the death certificate that the cause of death was atrial fibrillation.

Plaintiff then filed her complaint in Contra Costa County Superior Court on November 7, 2001, alleging breach of contract and tortious breach of the implied covenant of good faith and fair dealing. Defendant was served with a copy of the summons and complaint on February 11, 2002, filed its answer on March 4, 2002 and its notice of removal to this court on March 6, 2002.

Defendant is a corporation with its principal place of business in Connecticut. Plaintiff is a citizen of California. This is a civil action between citizens of different states and the amount in controversy exceeds $75,000. This court has original jurisdiction under 28 U.S.C. § 1332, and the

case was properly removed under the provisions of 28 U.S.C. § 1441(a).

On July 24, 2002, both parties consented to proceed before a U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(c). On September 24, 2002, the defendant filed its Motion for Summary Judgment or in the alternative for Partial Summary Judgment.

## POSITIONS OF THE PARTIES

Defendant moves for summary judgment on the grounds that there is no genuine issue of material fact that Robert Schar's death was not due to a bodily injury resulting directly from an accident and independently of all other causes, and that the efficient proximate cause of death was either his chronic heart disease or the surgical treatment of his disease of osteoarthritis. Therefore, Hartford claims it is entitled to summary judgment in its favor on Plaintiff's causes of action for breach of the insurance contract and breach of the implied covenant of good faith and fair dealing.

In the alternative, Defendant moves for an order granting summary judgment solely on the cause of action for breach of the implied covenant of good faith and fair dealing, on the grounds that Defendant did not act unreasonably in denying benefits to Plaintiff under her deceased husband's accidental death insurance policy and that there was a genuine dispute as to the existence of coverage; therefore, Defendant did not act in bad faith in denying Plaintiff's claim for benefits.

Also in the alternative, Defendant moves for an order granting summary judgment in its favor on Plaintiff's claim for punitive damages on the grounds that there is no clear and convincing evidence that Defendant acted with fraud, oppression or malice in denying benefits to Plaintiff under her deceased husband's accidental death insurance policy.

Plaintiff opposes the motion on the grounds that there are genuine issues of material fact as to the cause of Robert Schar's death, whether it was an accident, and whether it was covered under the policy. In addition, Plaintiff contends that there are genuine issues of material fact whether Defendant waived denial of coverage for Mr. Schar's death because it was due to a non-accident, invoking the "sickness or disease" exclusion under the policy.

Assuming in the alternative that Mr. Schar's death was caused by a pulmonary embolism that developed two weeks after his surgery, Plaintiff contends that there are genuine issues of material fact whether a pulmonary embolism constitutes an accident, under the policy.

Finally, Plaintiff contends, because the coverage issue cannot be decided by summary judgment, that the bad faith component of her claim is also not amenable to summary adjudication, due to unfair handling of the claim by Defendant.

## ANALYSIS

### Summary Judgment

Rule 56, Federal Rules of Civil Procedure, provides for summary judgment when "the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court does not make credibility determinations or weigh conflicting evidence, and views the evidence in the light most favorable to the

nonmoving party. *T.W. Elec. Serv. v. Pac. Elect. Contractors Ass'n*, 809 F.2d 626, 630–631 (9th Circ.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The moving party may meet its burden of establishing that there is no genuine issue of material fact by pointing out the absence of evidence from the non-moving party or disproving an essential element of plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. The mere existence of a "scintilla" of evidence in support of the nonmoving party's position is not sufficient. The nonmoving party has the burden of establishing sufficient evidence on each element of his case so that a jury could return a verdict for him. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. If the evidence is so one-sided that a reasonable jury could not find for plaintiff, who has the burden of proof at trial, then the moving party must prevail, as a matter of law. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir.1995). Where, as here, the moving party will not have the burden of proof at trial, all that is necessary initially is for Defendant, as the moving party, to point to the lack of evidence of a claim by the party having the burden of proof. Plaintiff must then show more than a mere scintilla of evidence to support her claim.

### What is an Accident?

A significant question is whether Mr. Schar died from a sickness or disease (atrial fibrillation) or what could arguably be an accident (an embolism). It is undisputed that if Mr. Schar's death was caused by atrial fibrillation it would be excluded under the sickness and disease provision of the insurance policy. It is contested by the parties whether an embolism is an accident and therefore covered under the policy.

A beneficiary suing to collect accidental death benefits has the burden of proving that the insured's death resulted from an accident. *Ells. v. Order of United Commercial Travelers of America*, 20 Cal.2d 290, 304, 125 P.2d 457 (1942); *Spaid v. Cal–Western States Life Ins. Co.*, 130 Cal.App.3d 803, 806–807, 182 Cal.Rptr. 3 (1982). In the present case, to survive summary judgment, and as the party having the burden of proof at trial, Plaintiff must present sufficient evidence to convince a reasonable jury that her husband died from an accident.

Plaintiff's accidental death policy provides coverage for "bodily injury resulting directly from accident and independently of all other causes." Insurance policies are contracts which are governed by the rules of contract interpretation. *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 666, 42 Cal.Rptr.2d 324, 913 P.2d 878 (1995). The laws of contract dictate that if ambiguous terms exist in the contract, the ambiguities are resolved against the drafter, in this instance the insurer. *Id.* at 667, 42 Cal. Rptr.2d 324, 913 P.2d 878.

Both parties, however, agree that the California Supreme Court has established a broad working definition for the term "accident" as "a casualty something out of the usual course of events and which happens suddenly and unexpectedly and without design of the person injured." *Geddes & Smith Inc. v. Saint Paul–Mercury Indem. Co.*, 51 Cal.2d 558, 563, 334 P.2d 881 (1959).

California courts distinguish "accidental means" policies and "accidental death" policies. *Paulissen v. United*

*States Life Insurance Co. in the City of New York,* 205 F.Supp.2d 1120, 1128 (C.D.Cal.2002) citing *Weil v. Fed. Kemper Life Assurance Co.,* 7 Cal.4th 125, 134–135, 140, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994); *Olson v. Am. Bankers Ins. Co. of Fla.,* 30 Cal.App.4th 816, 822, 35 Cal. Rptr.2d 897 (1994). This distinction is significant because "accidental means" policies require an insured to show that the death resulted from some intervening element of force or violence while "accidental death" policies merely require the insured to show that the death was unforeseen. *Paulissen,* 205 F.Supp.2d at 1128.

In *Olson* and *Paulissen* the insurance policies in question were identical. In *Paulissen,* the policy covered injuries caused by an accident. The insurance company, however, failed to use the word "means" in drafting the policy. Since ambiguities are resolved against the insurer, the court held that the policy was an "accidental death" policy requiring the insured to show only that the death was unforseen. *Id.* at 1128.

Plaintiff argues that federal courts hold a death to be an accident "if the death of the insured was objectively unexpected and unintended by the insured and happened out of the usual course of events." *Bornstein v. J.C. Penney Life Ins. Co.,* 946 F.Supp. 814, 818–819 (C.D.Cal.1996). In *Bornstein,* the insured died during open heart surgery. An autopsy revealed that death was from a stroke caused by the surgical procedure. The court reasoned that if the death was objectively unexpected and unintended by the insured and happened outside of the usual course of events then the death was an accident.

The accidental death and dismemberment policy in the *Bornstein* case did not define an accident but did define an injury. Unlike the policy in the case at bar, it lacked an exclusion for sickness or disease. The court found that there were genuine issues of material fact as to whether the insured's death was unexpected, unintended, and happened out of the usual course of events. *Id.* at 819. Thus, the defendant's motion for summary judgment was denied. *Id.* at 822.

Plaintiff cites the decision in *Bornstein* for the proposition that her husband's knee replacement surgery was similar to the surgical procedure in *Bornstein,* which the court found to be an unforeseen external event or occurrence.

Defendant in the case at bar, however, relies on the *Khatchatrian* case. *Khatchatrian v. Continental Casualty Co.,* 198 F.Supp.2d 1157, 1164 (C.D.Cal.2002). In that case, the insured died from a stroke that resulted from high blood pressure. The patient had cancer and as part of the treatment, one kidney had been surgically removed. Patients with one kidney are at risk for uncontrolled high blood pressure.

The accidental death and dismemberment insurance policy in that case, as in the case at bar, did not define "accident," although it did define injury. There was also, as in the case at bar, a sickness and disease exclusion. The court held that the death of the insured from a stroke due to high blood pressure was caused by a process within his body, rather than by an external event and thus could not be accidental. The court expressed its belief "that if the cause of death was a process or occurrence that took place solely within the decedent's body, it cannot be 'external' and thus cannot be 'accidental.'" *Id.* at 1164. The court expressly criticized the *Bornstein* test as being too broad and imprecise. *Id.* The court granted summary judgment for the insurance company.

The court's decision in the *Khatchatrian* case followed a line of cases in the California courts which require that an external force cause the injury in order to for it to constitute an injury or "accident." The

court cites numerous examples. A trial court's judgment that the insured's death was not an accident was affirmed, because there "was no evidence of falling, slipping, overexertion, or of any external force striking the body of the appellant." The external event itself must be the cause of the injury. (Court affirmed summary judgment for the insurance company where the plaintiff suffered an unforeseen retinal tear which was aggravated by jogging because the activity of jogging did not cause the tear and could not be characterized as an "accident.") An unforeseen external event must cause the death. (Appeals court affirmed a jury verdict for the defendant-insurer where the insured was found dead in his car from bronchopneumonia and there was no evidence of an unforeseen, external event causing the insured's death). Pursuing an activity is not an accident even if it results in injury. (Court reversed a jury verdict for the beneficiary where the insured suffered successive hemorrhages after swimming but there was no evidence that the insured slipped or suffered some other similar accident while swimming.) *Khatchatrian*, 198 F.Supp.2d at 1163. (Internal citations omitted).

In contrast to cases in which the cause of injury has been found not to be an accident, the court in *Khatchatrian* found that where California courts have found an injury to be "accidental," some external unforseen event was the proximate, if not the sole, cause of the injury. Again, the decision cites numerous examples: burns suffered in an accidental fire caused insured's death— covered under the accidental death policy; coverage for accidental death found where insured died from bleeding that commenced when the insured slipped and fell; death ruled accidental where the insured, a deputy sheriff, died after pursuing a suspect on foot, thereby aggravating a preexisting condition by putting unusual physical stress on

the body; insured's death was accidental where the insured's heart failure resulted from a car accident. *Id.* (Internal citations omitted.) Finally, even when the external, unforeseen event aggravated a preexisting medical condition of the insured and thereby led to the death or injury, in each case the court emphasized that the external, unforeseen event was a proximate cause of the death or injury. *Id.* at fn. 5.

In the case at bar Plaintiff contends that there is a factual dispute regarding the cause of Mr. Schar's death— whether it was atrial fibrillation or a pulmonary embolism. If it was a pulmonary embolism, says Plaintiff, it could have been an accident, because it resulted from an external event, the surgery, and it was unexpected.

Dr. Knight, however, testified at his deposition that a pulmonary embolism is the most common cause of death following surgery, including a knee replacement such as he performed on Mr. Schar. This statement supports the Defendant's contention that an embolism is foreseeable and, therefore by definition not an accident.

Dr. Knight testified:

"My presumption has always been that the most common cause of death following surgery, major surgery, joint surgery like this, either total knee or total hip are the most common, is pulmonary embolism that causes a sudden cardiac arrest, arrhythmia, or it can block off veins or the arteries to the lung and cause some problems there." (Knight at 10:9–15)

Dr. Knight stated he believes that the majority of surgical patients develop embolisms, but that most of the time they are "silent" and cause no problems, but that they are most likely to be fatal in the immediate post-operative period (the first six weeks following surgery). He testified that a small percentage of postoperative patients, perhaps 1%, will develop a fatal

pulmonary embolism, despite treatment. (Knight at 17:3–7)

Dr. Knight also testified:

[i]n studies that have been done in ·universities or whatever the incidents of blood clots is probably between 40 and 80 percent of all people develop blood clots. The vast majority of those blood clots, as a matter of fact—

[T]he one time that we know that pulmonary embolism can occur and be fatal is in the postoperative period, particularly after the six weeks of surgery.

Q: [Y]ou foresaw that an embolism is one of the complications that can arise from a knee surgery?

A: Correct

(Knight 15:26, 16:1–14, 23:17–20, 27:12–15)

In fact, the development of an embolism as a complication was such a foreseeable consequence of Mr. Schar's knee surgery that Dr. Knight took preventive measures:

[A pulmonary embolism is] certainly one that we take extra precautions for because it occurs frequently enough that we try to avoid it if at all possible.

Q: During Mr. Schar's knee surgery what precautions if any were taken by you to prevent embolisms after surgery or during surgery?

A: During surgery there really isn't much that we can do. We typically use tourniquets on the leg to prevent blood flow so that during the operation the flow of blood is basically stopped from going to the rest of the body. That prevents a lot of bleeding, so the development of additional blood clots is limited.

After the operation we place the patients back on anticoagulant medication. So beginning the day after surgery they're placed on medication to hopeful-

ly prevent the development of blood clots.

(Knight 37:19–21, 36:9–21).

Plaintiff attempts to distinguish "foreseeable" from "foreseen," to show that, while Dr. Knight anticipated an embolism of some kind, making an embolism *per se* foreseeable, he did not anticipate a *fatal* embolism, so if Mr. Schar's death resulted from such an embolism it was not foreseen, and therefore was an accident. (Knight Transcript at 33:9–11; 32:17–33:8). This is an artificial distinction. This same line of reasoning was adopted in the *Bornstein* decision and rejected by the court in *Khatchatrian.*

This court also rejects the rationale of the court in the *Bornstein* case and adopts the reasoning of the court in the more recent *Khatchatrian* decision. As the court in that case states: "nearly all deaths are unintended by the insured, whether they are 'expected' is impractical to ascertain and so is whether they happen outside of the usual course of events." *Khatchatrian,* 198 F.Supp.2d at 1164.

The court observed that, under *Bornstein,* "To extend coverage to situations where, as here, there is no such external, unforeseen event that is a proximate cause of the death or injury would convert A D & D policies into standard life insurance." *Id.*

■ In the case at bar, Mr. Schar's surgery was not an unforseen external event; he chose to have it. If an embolism caused his death, it was also not an unforeseen external event, but a physical process which happened inside his body. Furthermore, it was a likely enough consequence of this type of surgery that his surgeon took measures to prevent it. If an embolism was a proximate cause of Mr. Schar's death, it was not an accident, but a sick-

ness or disease, and not covered under his accidental death policy.

### Waiver

■ In her opposition to Defendant's motion, Plaintiff argues that Hartford intentionally and explicitly waived its defense that it properly denied coverage because Mr. Schar's death was not an accident. Plaintiff claims that Hartford waived its right to deny coverage for Mr. Schar's death as not resulting from an accident because at the time it denied benefits it did not expressly dispute that an embolism was an "accident." Rather, Hartford stated in its denial letter that it relied on the provision of the policy, which excludes coverage for death caused by sickness or disease.

■■ "Waiver is an affirmative defense for which the insured bears the burden of proof" and "California courts will find waiver when a party intentionally relinquishes a right or when a party acts so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 33–34, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (citing *Intel Corp. v. Hartford Acc. & Indem. Co.,* 952 F.2d 1551, 1559–1560 (9th Cir.1991)).

In *Waller,* an insurance company refused to defend a lawsuit on the grounds that the commercial general liability policy did not provide coverage for emotional distress from economic loss alleged in a third party complaint. The denial letter read:

"We have received your claims for attorney fees…we have reviewed your policy in its entirety and submitted the entire packet of information to our Regional Office for a decision…the claim is essentially … a Shareholder dispute … not covered under your …policy… or any endorsements… we are unable

to make payment for legal expenses incurred … in this matter."

The plaintiffs in that case alleged that because the denial letter failed to state specifically that the policy did not cover "economic losses," the insurance company waived its right to deny coverage for attorney's fees and its duty to defend. The court held that the denial letter did not indicate a clear intention on the insurance company's part to relinquish alternative reasons for denial of a duty to defend and its actions were not inconsistent with the intent to enforce the policy. *Id.*

The court found no waiver, "Waiver requires the insurer to intentionally relinquish its right to deny coverage, and a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial." *Waller v. Truck Ins. Exchange, Inc. supra,* 11 Cal.4th at 2, 44 Cal.Rptr.2d 370, 900 P.2d 619.

In the case at bar, the Defendant's letters to Mrs. Schar deny coverage on the grounds that Mr. Schar died of sickness or disease, a cause not covered by the policy. Hartford's denial of Plaintiff's claim for Accidental Death benefits based on the sickness or disease exclusion does not impliedly waive other grounds. Hartford merely chose to apply the sickness/disease exclusion. The July 25, 2000 letter reads as follows:

This letter responds to your letter of April 22, 2000 ("Appeal Letter") appealing Hartford Life Insurance Company's denial of Accidental Death benefits for Robert Schar … In your Appeal Letter, you referenced case law regarding the medical / surgical exclusion which is inapplicable in this case. We are not applying this exclusion for the denial of benefits. Benefits are not payable since the policy excludes benefits for medical

treatment of a sickness or disease. Therefore, we must reaffirm our denial of benefits under the provisions of the Policy. (D.E.B, HFC011–HFC012). (Emphasis added)

Hartford's August 3, 2000 letter further clarified and explained the reasons it denied the Accidental Death benefits. The letter states that Hartford was not expressly claiming that a post-operative embolism was not an accident, but was saying instead that the cause of death was atrial fibrillation, and therefore Mr. Schar's death was due to sickness or disease and excluded on that basis.

The letter states:

In your Appeal Letter, you referenced case law holding that post-operative embolism is an "accident" at common law and therefore Hartford may not deny benefits based on the medical/surgical exclusion. However, **we are not applying this exclusion for the denial of benefits. We are applying the exclusion of "loss resulting from sickness or disease."** Therefore, the case law you referenced is not applicable. We are denying the claim based on the exclusion for "loss resulting from sickness or disease." We determined that Mr. Schar had a history of atrial fibrillation... Mr. Schar died of cardiac arrest due to atrial fibrillation. Since his death was caused by a disease then, and benefits for injuries caused by sickness or disease are not covered under the Policy, then no benefits are payable. (*Id.* at HFC016–HFC017). (Emphasis added)

In the case at bar, Defendant did not expressly reject Plaintiff's claim because the embolism was not an "accident," rather it chose to reject her claim because, based on the death certificate, the cause of death was atrial fibrillation and therefore undeniably subject to the sickness and disease exclusion. Hartford's letter merely stated that since Hartford was not applying the medical-surgical exclusion the case law cited by Plaintiff's counsel was inapplicable.

This court finds that Hartford did not expressly waive any contention that an embolism, if it caused Mr. Schar's death, was not an accident under the policy, by merely choosing one of the alternative exclusions available to it. In fact, this option was a reasonable one at the time, because the Certificate of Death listed the cause of death as cardiac arrest caused by atrial fibrillation and Dr. Knight's Proof of Death form submitted at Hartford's request listed the cause of death as cardiac arrest secondary to pulmonary embolism, with a possible contribution of atrial fibrillation. Hartford's reliance on the sickness and disease exclusion does not constitute the express waiver the law requires.

The parties do not dispute that Mr. Schar died either of atrial fibrillation or a pulmonary embolism.[12] It is undisputed that atrial fibrillation is a sickness or disease and would be excluded from coverage under the policy. The parties dispute whether a pulmonary embolism following surgery is an accident for the purposes of coverage under the policy. This court finds as a matter of law that under the circumstances of this case, Mr. Schar's surgery was not an external event and that the pulmonary embolism, a foreseeable and foreseen consequence of knee replacement surgery, was not an accident, under California law.

There was no coverage under the policy, and Defendant's denial of coverage was proper and not a breach of the insurance contract. Furthermore, defendant did not waive its entitlement to claim that Mr. Schar's death was not caused by an accident under California law. For all the above reasons, this court finds that it must

---

**12.** Either of which could have resulted in his cardiac arrest.

grant summary judgment to Defendant on Plaintiff's cause of action for breach of the insurance contract.

### BAD FAITH CLAIM

■ Where a plaintiff is not entitled to benefits under the terms of the policy, Plaintiff's remaining claims also fail as a matter of law. *McMillin Scripps North Partnership v. Royal Insur. Co. of America,* 19 Cal.App.4th 1215, 1222–23, 23 Cal. Rptr.2d 243 (1993) (holding that absent the insured's primary right to receive the benefits of the contract "the auxiliary implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings.") *Id.* at fn. 9, (*cited in Khatchatrian,* 198 F.Supp.2d 1157 at 1165.). *See also Waller v. Truck Insur. Exchange, supra* 11 Cal.4th 1, at 35, 44 Cal.Rptr.2d 370, 900 P.2d 619, (holding that absent coverage there can be no action for breach of the implied covenant of good faith and fair dealing). Where, as here, there is no coverage under the policy, and therefore no breach of contract, there can be no liability for breach of the covenant of good faith and fair dealing. Accordingly, Defendant's motion for summary judgment is granted as to this cause of action as well.

### CONCLUSION

For all of the above reasons, Defendant's motion for summary judgment is granted, as to Plaintiff's causes of action for both breach of the insurance contract and breach of the covenant of good faith and fair dealing. Judgment shall be issued for Defendant, Plaintiff shall take nothing by her complaint. The clerk shall close the file.

IT IS SO ORDERED