Anthony HEIGHLEY, Plaintiff,

v.

**J.C. PENNEY LIFE INSURANCE CO. and J.C. PENNEY CO., INC., Defendants.**

No. 02–7794 NM.

United States District Court,
C.D. California,
Western Division.

April 14, 2003.

Alan I. Moss, Alan I. Moss Law Offices, San Francisco, CA, for Anthony Heighley, Plaintiff.

Margaret Levy, Becky J. Belke, Manatt Phelps & Phillips, Los Angeles, CA, Thomas M. Herlihy, Michael G. Glanzberg, Jeffrey R. Cluett, Kelly Herlihy & Klein, San Francisco, CA, for J.C. Penny Life Insurance Co., J.C. Penny Co. Inc., defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR CONTINUANCE

MANELLA, District Judge.

## I. INTRODUCTION

On August 7, 2001, Anthony Heighley ("Plaintiff") filed an action in San Francisco Superior Court against J.C. Penney Life Insurance Co. ("JCPenney Life") and J.C. Penney Co., Inc. (JCPenney Co.) (collectively "Defendants"), and Does 1 through 20 inclusive. Plaintiff's Complaint alleges: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) negligence, (4) violation of Bus. & Prof.Code § 17200, and (5) violation of Bus. & Prof.Code § 17500. On September 6, 2001, Defendants filed a notice of removal to the United States District Court for the Northern District of California. On October 7, 2002, this court accepted transfer. This action arises out of Defendants' denial of policy benefits to Plaintiff in connection with the death of his mother.

Currently before the court are (1) Defendants' motion for summary judgment or, in the alternative, partial summary judgment and (2) Plaintiff's motion for a continuance to conduct discovery pursuant to Federal Rule of Civil Procedure 56(f). Defendants assert the following grounds:

(1) on Plaintiff's first claim for breach of contract that Plaintiff has not met his

burden of establishing a triable issue of fact as to coverage;

(2) on Plaintiff's second claim for breach of the covenant of good faith and fair dealing that:

 (a) Plaintiff's claim is barred by the statute of limitations;

 (b) JCPenney Life acted reasonably and Plaintiff's claim was properly denied; and

 (c) at most, a genuine dispute as to coverage existed.

(3) on Plaintiff's third claim for negligence that:

 (a) Plaintiff's claim is barred by the statute of limitations;

 (b) such a claim is improper against an insurance company; and

 (c) JCPenney Life acted reasonably at all times.

(4) on Plaintiff's fourth and fifth claims for violation of Business and Professions Code sections 17200 and 17500 that JCPenney Life did not violate these sections;

(5) on each and every claim asserted by Plaintiff against JCPenney Co. that JCPenney Co. had no involvement in the denial of Plaintiff's claim or other acts complained of by Plaintiff, and therefore is an improper party to this lawsuit; and

(6) on Plaintiff's request for punitive damages that JCPenney Life did not act with malice, oppression, or fraud.

---

**1.** Hereinafter, the court will refer to the Certificate issued to Mrs. Heighley as either "the Certificate" or "policy."

**2.** While Plaintiff objects to Exhibit B to the Costa Declaration as "hearsay," he does not claim that the Certificate issued to Mrs. Heighley was different from that provided in Exhibit B. Additionally, Plaintiff refers to this exhibit in his own papers. Accordingly, the court will accept Exhibit B as a true and accurate representation of the Certificate issued to Mrs. Heighley.

## II. RELEVANT FACTUAL BACKGROUND

This action arises out of an "Accidental Death and Dismemberment" Group Policy of insurance ("Group Policy") issued by J.C. Penney Life Insurance Company ("JCPenney Life") to J.C. Penney Co., Inc. ("JCPenney Co."), under which Margaret Heighley, Plaintiff's mother, was covered. Defendants' Uncontroverted Facts ("UF") 1; Declaration of Charles Costa ("Costa Decl.") ¶ 2. Mrs. Heighley was eligible for coverage under the Group Policy because she was a JCPenney Co. credit card holder. UF 2; Costa Decl. ¶ 2. The Group Policy is subject to California Insurance Code section 106. Plaintiff's Genuine Issues, Pl. Fact ("Pl.Fact") 3.

On October 23, 1990, Mrs. Heighley completed a written enrollment form for coverage under the Policy. Costa Decl. ¶ 3, Ex. A. On or about November 2, 1990, Mrs. Heighley was issued Accidental Death and Dismemberment Certificate No. 74A6414795 by JCPenney Life which evidenced her coverage under the Group Policy.[1] UF 4; Costa Decl. ¶ 3, Ex. B (Certificate).[2] Mrs. Heighley paid monthly premiums of $3.95, which were billed to her JCPenney Co. credit card. UF 6; Costa Decl. ¶ 3. Mrs. Heighley developed malignant breast cancer in 1992 at the age of 76 and underwent radiation therapy. UF 7, Costa Decl. ¶ 4.[3] In early 1997, as a

---

**3.** Plaintiff denies that this is undisputed although essentially the same factual statement is made by one of Plaintiff's expert witnesses. *See* Declaration of Satkamal Dhadly, M.D. ("Dhadly Decl.") ¶ 3. Plaintiff objects that the Costa Declaration is based on a review of the claims file, without greater specificity as to particular documents and whether they were authenticated. As JCPenney Life's Vice President of Claims, Mr. Costa may properly testify as to the contents of the claims file.

result of symptoms of shortness of breath and chest discomfort, Mrs. Heighley underwent diagnostic testing, which indicated pulmonary nodules as well as a right pleural effusion. Bone scans were consistent with metastatic disease. UF 8; Costa Decl. ¶ 4; Moss Decl., Ex. 10 (Discharge Summary of Dr. Fakhrai), p. 1 of 4.

On April 4, 1997, Mrs. Heighley was admitted to Providence Holy Cross Hospital and underwent surgery that same day, specifically a bronchoscopy, thoracostomy and thoracotomy, all performed by Dr. Mehdi Fakhrai. UF 9; Costa Decl. ¶ 5; Moss Decl., Ex. 10 (Discharge Summary of Dr. Fakhrai), p. 1 of 4. At the time she was admitted, Mrs. Heighley was cleared for surgery based on her physical exam and testing by cardiology and pulmonology specialists. Pl. Fact 6; Moss Decl., Ex. 6 (Dr. Mogul Dep.), 66:4–8. The results of the procedures indicated tumor nodules in the lung and pleura, which were biopsied. Costa Decl. ¶ 5. The biopsy revealed that Mrs. Heighley had breast cancer which had metastasized to her lungs. Costa Decl. ¶ 5; Mot., p. 7. Postoperatively, the patient was "coming along well" and was transferred after 24 hours from the ICU to the General Medicine floor. Pl. Fact 7; Moss Decl., Ex. 10 (Discharge Summary of Dr. Fakhrai), p. 1 of 4.

On April 13, 1997, Mrs. Heighley went into respiratory arrest and was treated for it. Pl. Fact 13; Moss Decl., Ex. 8 (Operative Report of Dr. Fakhrai), p. 1 of 2; Moss Decl., Ex. 16 (Defendant's Supplemental Response to Plaintiff's Request for Admissions), Response to Request No. 27. On or about May 16, 1997, Mrs. Heighley was transferred to Vencor Hospital, a long-term care facility. UF 11; Costa Decl. ¶ 6. From April 13, 1997 until her death, Mrs. Heighley was never able to be removed from a respirator, although several attempts were made to wean her from it. Pl. Fact 15; Moss Decl., Ex. 16 (De-

fendant's Supplemental Response to Plaintiff's Request for Admissions), Response to Request No. 31. Mrs. Heighley died May 28, 1997 at Vencor Hospital. UF 12; Costa Decl. ¶ 6; Compl. ¶ 9. No autopsy was performed after her death. UF 12; Costa Decl. ¶ 6.

On or about February 27, 1998, Plaintiff contacted JCPenney Life regarding submitting a claim for payment under the Policy issued to his mother. UF 13, Costa Decl. ¶ 7. In a letter dated March 3, 1998, JCPenney Life advised Plaintiff that coverage consisted of accidental coverage only, and that from the information furnished, it appeared Mrs. Heighley's death was due to natural causes and no benefits would be payable. UF 14; Costa Decl. ¶ 8, Ex. C. Nevertheless, JCPenney Life provided Plaintiff with claim forms, including an attending physician's statement form and an authorization form. *Id.* On or about March 19, 1998, JCPenney Life received an Accidental Death Affidavit of Claimant from Plaintiff, along with an affidavit stating that Plaintiff was the only surviving child of Mrs. Heighley. UF 15; Costa Decl. ¶ 9, Ex. D. The Accidental Death Affidavit of Claimant stated:

> After entering the hospital for a biopsy during her recovery, she was mismedicated, leading to a deterioration which weakened her and resulted in her health also deteriorating[,] ending in her death.... I have a lawyer preparing a suite [sic] against the hospital. Should they admit their mistake it would then prove that my mother was killed due to an accident caused by her treatment at the hospital. I am filing this claim now to avoid any statute of limitations in the future.

UF 15; Costa Decl. ¶ 9, Ex. D.

In response to JCPenney Life's request, Plaintiff provided a copy of his mother's Death Certificate and the signed authori-

zation form on or about April 21, 1998. UF 19; Costa Decl. ¶ 13, Ex. H. On April 24, 1998, JCPenney Life requested medical records from Mrs. Heighley's health care providers, Providence Holy Cross Medical Center, Vencor Hospital, Dr. Samuel Mogul, and Dr. Mehdi Fakhrai. Costa Decl. ¶ 14. On August 18, 1998, JCPenney Life sent a letter to Plaintiff denying benefits on the ground that Mrs. Heighley did not die as a result of a covered injury. UF 30; Costa Decl. ¶ 22, Ex. M. The letter advised Plaintiff that the Death Certificate indicated that Mrs. Heighley's death was the result of cardiorespiratory arrest due to respiratory distress due to metastatic cancer of the lungs, and that the Medical Examiner's Office had advised that the case was not referred to that office because it was not a Medical Examiner's case. *Id.*

On or about October 28, 1999, JCPenney Life received a letter from Plaintiff which enclosed a copy of his Settlement Agreement with Providence Holy Cross Hospital in connection with the medical malpractice action Plaintiff had filed in Los Angeles Superior Court against the hospital. UF 31; Costa Decl. ¶ 23, Ex. N. Plaintiff's medical malpractice case against Providence Holy Cross Hospital settled for $6,000, before defendant's motion for summary judgment was scheduled to be heard. UF 32; Belke Decl. ¶ 2, Exs. S, T. JCPenney Life acknowledged receipt of the Settlement Agreement and reiterated its denial of Plaintiff's claim in a letter dated November 2, 1999. UF 34; Costa Decl. ¶ 24, Ex. O. Specifically, JC Penney Life advised Plaintiff that the settlement release did not establish that medical malpractice was involved and pointed out that liability was explicitly denied by Providence Holy Cross Hospital. *Id.*

Plaintiff then initiated a complaint with the Department of Insurance. UF 35; Costa Decl. ¶ 25, Ex. P. In his complaint, Plaintiff contended that his mother was mismedicated while hospitalized, slipped into a coma, and died seven weeks later. *Id.* Plaintiff also acknowledged that "As there are certain areas where I can understand the company's case, I would suggest that $10,000 or 2/3 of the $15,000 policy would seem fair." *Id.* At the request of the Department of Insurance, JCPenney Life reevaluated Plaintiff's claim and reiterated the reasons for denial of the claim in a letter to Plaintiff that was provided to the Department of Insurance along with a copy of the claim file. UF 36, 37; Costa Decl. ¶¶ 26, 27; Exs. Q, R. The Department of Insurance informed JCPenney Life that it might not hear from the Department again "unless we need further information or we make a determination that the consumer's complaint is justified, or we otherwise make a determination that there has been a violation of applicable law." UF 36; Costa Decl. ¶ 26, Ex. Q. JCPenney Life never heard anything further from the Department of Insurance with respect to Plaintiff's claim. UF 37; Costa Decl. ¶ 27.

## III. RULE 56(F) MOTION

Plaintiff requests additional time within which to conduct discovery on the issue whether Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and negligence are barred by the applicable statutes of limitations. Federal Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or

discovery to be had or may make such other order as is just.

Fed. R. Civ. Proc. 56(f).

█ On February 10, 2003, the court granted Defendants' motion to amend their answer to add the affirmative defense of the statute of limitations. In its order, the court noted that "Plaintiff remains free to apply for an extension of discovery upon a showing that such discovery is necessary to respond to any statute of limitations defense." Order of February 10, 2003. Plaintiff did not promptly apply for an extension of discovery, but instead—more than a month later, and after Defendant's motion for summary judgment had been filed—sought such an extension by way of a Rule 56(f) motion. Significantly, when Plaintiff sought, and received, a one-week extension to prepare his opposition to Defendants' summary judgment motion, he made no suggestion that he needed additional discovery to oppose the motion. Plaintiff's request, at this late date, is inexcusably untimely. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 921 (quoting *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir.1995)) ("[T]he district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past.").

Moreover, the discovery Plaintiff allegedly seeks is irrelevant. Plaintiff contends that because the policy contains a provision governing "actions on the policy," it is necessary to determine what the insurer, *"the drafter of this adhesion contract,"* meant by this provision. Opp., p. 21 (em-

phasis in original); Moss Decl. ¶ 2. As Plaintiff acknowledges, however, this provision is *"required verbatim* by California Insurance Code § 10350.11." Opp., p. 21 n. 50 (emphasis in original).

█ Accidental death policies, such as that at issue here, fall within the definition of "disability insurance" under the Insurance Code. Croskey, Heeseman & Johnson, *Cal. Prac. Guide: Insurance Litigation* § 6:480 (The Rutter Group 2002) ("Rutter's") (citing Cal. Ins.Code § 106); *Williams v. American Cas. Co.*, 6 Cal.3d 266, 276–77,. 98 Cal.Rptr. 814, 491 P.2d 398 (1971) (group accidental death policy treated as a "group disability policy."). Accordingly, pursuant to Cal. Ins.Code §§ 10270 et seq., accidental death policies must contain the mandatory provisions required in disability insurance policies. *Id.* The wording must be the same as that used in the statute unless it is "not less favorable in any respect" to the insured or the beneficiary and is approved by the insurance commissioner. *Id.* (citing Cal. Ins.Code § 10369.1); *Olson v. American Bankers Ins. Co.*, 30 Cal.App.4th 816, 827, 35 Cal. Rptr.2d 897 (1994).[4]

██ As the language of the provision at issue is mandated by the insurance code, deposing JCPenney Life employees regarding "their intent in drafting this language or the meaning they put on this language" (Moss Decl. ¶ 2) would be of no help to Plaintiff. This is likewise true of the provision in the policy pertaining to "proof of loss," also referenced by Plaintiff

---

4. Section 10350.11 provides:

A disability policy shall contain a provision which shall be in the form set forth herein. Legal Actions: No action at law or in equity shall be brought to recover on this policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this policy. No such action shall be brought after the expiration of three years after the time written proof of loss is required to be furnished.

The policy provision states:

Legal Actions

No action can be brought to recover on the policy for at least 60 days after written proof of loss has been furnished. No such action shall be brought more than 3 years after the date proof of loss is required. Costa Decl., Ex. B, p. 7.

(Moss Decl. ¶ 2), as this provision is mandated by Cal. Ins.Code § 10350.7. Further, the provisions cited by Plaintiff are relevant only to the contractual limitation period for filing a legal action. Defendants do not rely upon the contractual provision as a bar to Plaintiff's claim, but rather assert a statute of limitations defense. *See* discussion *infra*. Moreover, the interpretation of an insurance contract is a question of law, not fact. *Waller v. Truck Ins. Exchange, Inc.* 11 Cal.4th 1, 18, 44 Cal. Rptr.2d 370, 900 P.2d 619 (1995) (citing *AIU Ins. Co. v. Superior Court* 51 Cal.3d 807, 818, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990)). Accordingly, the court denies Plaintiff's Rule 56(f) motion for a continuance to conduct discovery on the statute of limitations issue.

## IV. SUMMARY JUDGMENT DISCUSSION

### A. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1).

In a trio of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex, supra; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. The governing substantive law dictates whether a fact is material; if the fact may affect the outcome, it is material. *See id.* at 248, 106 S.Ct. 2505. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, it must satisfy its burden with affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When assessing whether the non-moving party has raised a genuine issue, the court must believe the evidence and draw all justifiable inferences in the non-movant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. 2505. As the Supreme Court explained in *Matsushita*,

> [w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted).

■ To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989).

### B. Application

This court's jurisdiction is based on diversity. Therefore California substantive law applies. *Insurance Co. of Pennsylvania v. Associated Int'l Ins. Co.,* 922 F.2d 516, 520 (9th Cir.1990) (*as amended* 1991); *Continental Casualty Co. v. City of Richmond,* 763 F.2d 1076, 1079 (9th Cir.1985). The parties have not disputed that California is the forum state and its law is to be applied in this case.

### 1. Improper Party

■ Defendants assert that JCPenny Co. is an improper party because it is the group policyholder in this case and nothing more. Motion, p. 26; Costa Decl. ¶ 28. Specifically, Defendants assert that JCPenny Life issued a group accidental death insurance policy to JCPenny Co., and that this group policy provided coverage to eligible JCPenny Co. cardholders. Defendants assert that JCPenny Co. had no contractual relationship with Mrs. Heighley or Plaintiff, and had no involvement in the investigation or denial of Plaintiff's claim. Mot., p. 26; Costa Decl. ¶ 28.

As Defendants assert, Plaintiff's Complaint acknowledges that JCPenney Life was the insurer and that JCPenny Co. was the "Sponsoring Member or Holder." Compl. ¶ 7. Further, Plaintiff expressly states that the claim was submitted to JCPenny Life (Compl.¶ 9), that JCPenny Life "refused, and continues to refuse, to pay ... benefits" (Compl.¶ 10), and that JCPenny Life "wrote plaintiff a letter contending that there was no coverage due" (Compl.¶ 21). *See* Mot., p. 26. Plaintiff's Complaint makes no allegations of wrongdoing against JCPenny Co. Moreover, Plaintiff has not disputed that JCPenny Co. is an improper party in its opposition. Accordingly, the court grants Defendants' motion for summary judgment on all claims against JCPenney Co.

### 2. Breach of Contract Claim

■ Defendants argue that Plaintiff has not met his burden of establishing a triable issue of fact as to coverage under the policy, and that JCPenney Life properly denied Plaintiff's claim. Defendants therefore assert that JCPenney Life did not breach the terms of the contract. In California, the burden is on the person claiming the accidental death benefits to establish that the insured's death resulted from an accident. *Ells v. Order of United Commercial Travelers of America,* 20 Cal.2d 290, 304, 125 P.2d 457 (1942); *Spaid v. Cal–Western States Life Ins. Co.,* 130 Cal.App.3d 803, 806–07, 182 Cal.Rptr. 3 (1982); *Rutter's* § 6:504 (citing *Zuckerman v. Underwriters at Lloyd's). London,* 42 Cal.2d 460, 473–74, 267 P.2d 777. This is consistent with the general principle that the burden of proof to establish coverage is on the insured. *Aydin Corp. v. First State Ins. Co.,* 18 Cal.4th 1183, 1188, 77 Cal.Rptr.2d 537, 959 P.2d 1213 (1998) (citing *Weil v. Federal Kemper Life Assurance Co.,* 7 Cal.4th 125, 148, 27 Cal. Rptr.2d 316, 866 P.2d 774 (1994)). "[T]o

survive summary judgment ... Plaintiff must present sufficient evidence to convince a reasonable jury" that the death was the result of an accident. *Schar v. Hartford Life Ins. Co.,* 242 F.Supp.2d 708, 714 (N.D.Cal.2003).

The term "accident" is not defined by statute, nor is it defined in most accidental policies, including the one at issue. Accordingly, the question whether a certain set of facts constitutes an "accident" is generally determined by case law. *See Rutter's* § 6:480.5. In *Bornstein v. J.C. Penney Life Ins. Co.,* 946 F.Supp. 814 (C.D.Cal.1996) (Rafeedie, J.), the court cited a California Supreme Court definition of an accident as "a casualty—something out of the usual course of events, and which happens suddenly and unexpectedly and without any design of the person injured." *Id.* at 818–19 (citing, *inter alia, Zuckerman v. Underwriters at Lloyd's, London,* 42 Cal.2d 460, 473, 267 P.2d 777 (Cal.1954)). The *Bornstein* court then defined an "accidental" death as one where "the death of the insured was objectively unexpected, unintended, and happen[ed] out of the usual course of events." *Id.* at 819. Applying this definition, the *Bornstein* court found there was a triable issue of fact as to whether a stroke suffered during open heart surgery was accidental, because there was evidence that the death was unexpected, without the intent of the insured, and unusual. *Id.* at 820.

Another Central District court has rejected the *Bornstein* definition of "accidental" as "both too broad and too imprecise." *Khatchatrian v. Continental Casualty Co.,* 198 F.Supp.2d 1157, 1164 (C.D.Cal.2002) (Matz, J.). Instead, the *Khatchatrian* court held that an injury or death was "accidental" only if "it was in some manner caused by an event or occurrence unforeseen and external." *Id.* at 1162. In *Khatchatrian,* the court found that because the insured's death was caused by a stroke, a process that took place wholly within the insured's body, it was not an accident and was not covered by the policy. *Id.* at 1163–64.[5] The *Khatchatrian* court acknowledged, however, that under California law, a death or injury may be accidental and thus covered under an accidental death policy even where the external event is not the sole cause of the death. *Id.* at 1164. The court further noted that in several California cases finding an injury to be accidental, the external, unforeseen event had aggravated a preexisting medical condition of the insured and thereby led to the death or injury, but the external unforseen event was a proximate cause of the death or injury. *Id.* at 1162 n. 5.[6]

In another Central District case, *Nagel v. Continental Casualty Co.,* 498 F.Supp. 265 (C.D.Cal.1980) (Williams, J.), the court found accidental death where an insured died unexpectedly, notwithstanding a preexisting illness or disease. In *Nagel,* there was no external event. The insured, who suffered from various ailments including cancer and adrenal insufficiency, became ill. The next morning, she entered the hospital, where she died the following day. An autopsy revealed that

---

**5.** In *Khatchatrian,* the policy had an exclusion for death or injury caused by "sickness or disease." *Id.* at 1164. The court determined that even assuming the death at issue could be termed "accidental," it was subject to this exclusion.

**6.** Concurrent causation issues arise where disease, illness or other excluded natural causes contribute to the death. Rutter's § 6:501. The modern test is "efficient proximate cause." Rutter's § 6:503 (citing *Garvey v. State Farm Fire & Cas. Co.,* 48 Cal.3d 395, 412, 257 Cal.Rptr. 292, 770 P.2d 704 (1989)). The accident need not "trigger" the death; it is sufficient if it was the predominating cause. *Id.*

the patient had strangled on her own vomit. The *Nagel* court stated that it was "crucial in this case" that the policy at issue did not include "accidental means" language. *Nagel*, 498 F.Supp. at 266.[7] The court found that there was "no plausible evidence that when the decedent entered the hospital on the day before she died, she was in a life threatening condition from the horribles that afflicted her over the years. On the contrary, she was robust, mobile, and had a good appetite." *Id.* The court concluded that the plaintiff had succeeded in showing "that it is more likely so than not so that the cause of death was from aspiration of gastric contents, and that this was accidental within the meaning of the policy." *Id.*

Neither the *Bornstein* nor the *Khatchatrian* court discussed whether the policy at issue in each case was an "accidental death" policy or an "accidental means" policy, although the policies in both cases appear to be accidental death policies based on the court's reading of the facts.[8] As noted by the court in *Olson v. American Bankers Ins. Co. of Florida*, 30 Cal. App.4th 816, 822, 35 Cal.Rptr.2d 897 (1994), "[t]his distinction is critical, because 'policies requiring only that there be proof of accidental death have been con-

strued broadly, such that the injury or death is likely to be covered unless the insured virtually intended his injury or death' .... [citation.]" *Id.* at 822, 35 Cal. Rptr.2d 897 (citing *Weil v. Federal Kemper Life Assurance Co.*, 7 Cal.4th 125, 140, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994)).[9]

Here, Plaintiff asserts—and Defendants do not dispute—that the policy at issue is an "accidental death" policy, not an "accidental means" policy. An accidental death policy "requires only that the insured's death was not designed or anticipated by the insured, *i.e.*, accidental death is an unintended and undesigned result even if caused by the insured's voluntary act." *Rutter's* § 6:482 (citing *Weil v. Federal Kemper Life Assur. Co.*, 7 Cal.4th 125, 134–35, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994)). An "accidental means" policy, on the other hand, requires not only an unintended death but also that the act or means which produced death be unexpected or unforseen. *Rutter's* § 6:484 (citing *Weil*, 7 Cal.4th at 134, 27 Cal.Rptr.2d 316, 866 P.2d 774). Without the word "means" in the policy, the policy will be construed as an "accidental death" policy. *Rutter's* § 6:484 (citing *Olson v. American Bankers Ins. Co.*, 30 Cal.App.4th 816, 824–25, 35 Cal.Rptr.2d 897 (1994)). The instant poli-

---

7. Under a typical "accidental means" provision, death benefits are payable if the claimant furnishes due proof that the insured "has suffered the *loss of life as the direct result of bodily injury, independent of all other causes, effected solely through external, violent and accidental means* ...." *Weil v. Federal Kemper Life Assurance Co.*, 7 Cal.4th 125, 130, 27 Cal.Rptr.2d 316, 866 P.2d 774 (1994) (emphasis in original). "Accidental means" policies are construed more stringently than "accidental death" policies. *See id.* at 140, 27 Cal. Rptr.2d 316, 866 P.2d 774.

8. The court in *Schar v. Hartford Life Insurance Co.*, 242 F.Supp.2d 708 (N.D.Cal.2003) applied *Khatchatrian*'s holding to its analysis of coverage under an "accidental death" policy. The *Schar* court found that death caused

by an embolism following surgery would not be accidental as it was not an unforeseen external event, but a physical process that happened inside the decedent's body. *Id.* at 717. The court concluded that the plaintiff's surgery was not an unforeseen event and that the embolism was not unforeseen, because "it was a likely enough consequence of this type of surgery that his surgeon took measures to prevent it." *Id.* Here, on the other hand, there is evidence of an unforeseen external event, *i.e.*, accidental mismedication.

9. In *Weil*, the court conjectured that accidental death policies may be given this broad interpretation because the insurer could have limited its liability by employing the "accidental means" language. *Weil*, 7 Cal.4th at 140, 27 Cal.Rptr.2d 316, 866 P.2d 774.

cy contains no accidental means language. Accordingly, the question under *Bornstein* is whether Mrs. Heighley's death was "objectively unexpected, unintended, and happen[ed] out of the usual course of events." *Bornstein,* 946 F.Supp. at 819.[10]

 Like the policies at issue in *Bornstein* and *Khatchatrian,* the policy at issue here requires that bodily injury be caused by an accident "directly and independently of all other causes." *Compare Bornstein,* 946 F.Supp. at 819; Costa Decl., Ex. B, p. 4. This phrase is construed narrowly. Rutter's § 6:486.1 (citing *Bornstein,* 946 F.Supp. at 818) (term "directly and independently of all other causes" construed in its most restrictive sense so as to allow for the greatest amount of coverage, as required by *AIU Ins. Co. v. Superior Court of Santa Clara County,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990)). The *Bornstein* court reasoned that "[t]o construe the term in a broad sense would be to narrow coverage to the point of rendering it nugatory, and would enable an insurer to point to one expected or intended factor in the chain of causation for a given event over which coverage is at issue, and thereby defeat its reasonably expected contractual obligation." *Id.* at 819. Accordingly, this phrase will not be construed to limit the coverage available here.

 Defendants argue that there is no admissible medical evidence that Mrs.

Heighley's death was caused by or even contributed to by any "unforeseen and external event." Reply, p. 8.[11] Instead, Defendants contend that the medical evidence points to only one conclusion—that Mrs. Heighley's death was the result of natural causes due to her metastatic lung cancer. *Id.*

Plaintiff disputes this assertion, and contends that, to the contrary, the evidence shows that on April 13, 1997, Mrs. Heighley was accidentally administered the wrong medication into her epidural catheter, which caused her to go into immediate respiratory arrest; that thereafter she required a respirator to assist her in breathing; that the respirator malfunctioned and had to be replaced; that she developed pneumonia as a result of long-term use of the respirator; and that she ultimately died of pneumonia caused by the mismedication. Opp., pp. 4, 9–10. The medical record and attending physician's testimony support certain of these allegations; Plaintiff relies upon expert testimony to support other of the allegations. *See* Moss Decl., Ex. 3 (handwritten note in medical records dated 4/13/97 re "Accidentally" infusing a substance into Mrs. Heighley's epidural catheter); Moss Decl., Ex. 6 (Deposition of Dr. Samuel Mogul), 37:7–23 ("The next note I wrote 4–13, and here's where I wrote that there was a note by the anesthesiologist referring to D–5 and water being instilled through the epidural cathe-

---

**10.** As previously discussed, the *Khatchatrian* court would add the requirement that the death be caused in some manner by an event or occurrence that is not only unforeseen, but external. *See id.* at 1162.

**11.** Defendants argue that declarations of three physicians submitted by Plaintiff as expert testimony are inadmissible because they do not set forth the "knowledge, skill, experience, training or education" necessary to qualify them as experts, pursuant to Federal Rule of Evidence 702. Defendants' Evidentiary Objections to Evidence, pp. 12, 16–17,

21. However, "Federal Rule of Evidence 702 . . . contemplates a broad conception of expert qualifications." *Thomas v. Newton Int'l Enterprises,* 42 F.3d 1266, 1269 (9th Cir. 1994). Any one or more of the bases given is sufficient to qualify a witness as an expert. 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 702.04[1][c] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2002) ("Weinstein's"). The court finds that at least one of these bases is asserted in each of the declarations submitted and therefore denies Defendants' request to strike.

ter resulting in a respiratory arrest."); Moss Decl., Ex. 6 (Dr. Mogul Dep.) 57:8–23 (stating that he believes that respiratory arrest was caused by the administration through the epidural catheter of either D–5 or Fentanyl); (Moss Decl., Ex. 8 (Operative Report of Mrs. Heighley's surgeon, Dr. Mehdi Fakhrai, procedure date 4/17/97)) ("For some reason, she received infusions of epidural medications, about eight days' postoperatively. She then had respiratory arrest. For that reason and because of retained CO2, she was intubated."); Moss Decl., Ex. 8 (Operative Report of Dr. Mehdi Fakhrai, procedure date 4/28/97) ("She has been on the ventilator. About a week after being on the ventilator, there was some machine malfunction. Finally, a couple of days ago, the machine was changed. She has been stable since then."); Moss Decl., Ex. 8 (Discharge Summary, Dr. Fakhrai) ("The patient was put on a ventilator and tried to wean off the machine. Unfortunately, after a few days it was found that the machine was not ventilating well and there was some malfunction of the machine that would not let the patient breathe around the machine . . . .").

Based on his review of the medical records, Dr. Satkamal Dhadly, one of Plaintiff's experts, states his opinion to a reasonable medical probability that Mrs. Heighley "developed a lung infection from being intubated and being on the respirator as long as she was; this caused her pneumonia to become difficult to treat, which ultimately led to her demise" and that "[s]he died as a result of this infection which was a direct result of her respiratory arrest." Dhadly Decl. ¶ 13. *See also* Richard Bohannon, M.D. Decl. ("Bohannon

Decl.") ¶ 3. Dr. Bohannon, an oncologist, is another of Plaintiff's experts. After reviewing Mrs. Heighley's medical records, Dr. Bohannon opined that she did not die of cancer, and that absent respiratory arrest, she could have expected to live another one to five years. Bohannon Decl. ¶ 3.

Even Defendants' expert, Dr. David Kaplowitz, could not eliminate the possibility that Mrs. Heighley's respiratory arrest was caused by an accidental administration of D5W. *See* Kaplowitz Decl. ¶ 14. At most, he stated that it was "unlikely" that the amount of medication Mrs. Heighley may have received would cause respiratory depression or arrest. *Id.* In any event, contradictory expert testimony merely creates a triable issue of fact.

■ In denying Plaintiff's claim, Defendants relied primarily upon the Settlement Agreement between Plaintiff and Providence Holy Cross relating to Plaintiff's medical malpractice action, which stated that his claim was "doubtful" and "disputed," and that the hospital was not admitting liability. Mot., p. 13; Costa Decl., Ex. N, p. 2. Defendants further assert that Plaintiff settled his malpractice claim for $6,000 in the face of a pending summary judgment motion brought by Providence Holy Cross, and that Plaintiff did not file an opposition to that motion. Mot., p. 13; Belke Decl., Ex. S (Response to Request for Admission No. 5). Obviously, settlement of the malpractice claim is not dispositive. Defendants also relied upon the Death Certificate, indicating that the immediate cause of death was cardiorespiratory arrest due to respiratory distress due to metastic cancer of the lungs. Costa Decl., Ex. H.[12] Defendants also note

---

12. With respect to the Death Certificate, it is true, as Defendants assert, that a death certificate is "prima facie evidence of the facts stated therein." Reply, p. 4 (citing Health & Safety Code § 10577; Cal. Evid.Code § 1281). However, a death certificate is

"subject to rebuttal and to explanation." *Morris v. Noguchi,* 141 Cal.App.3d 520, 523 n. 1, 190 Cal.Rptr. 347 (1983). Defendants note that the box marked "Accident" was not checked, but concede that the physician completing the Death Certificate did not have the

that as a result of Plaintiff's complaint, JCPenney Life provided the California Department of Insurance with a copy of its claim file and all correspondence between JCPenney Life and Plaintiff. As JCPenney Life has not been contacted by the department since it sent its December 3, 1999 letter to Plaintiff responding to the issues raised, Defendants assert that the Department of Insurance has presumably concluded that Plaintiff's claim was without merit. Mot., p. 14. Defendants do not assert, however, that the Department of Insurance is the final arbiter of the viability of Plaintiff's legal claims.

 It is evident that there is a genuine issue of material fact in dispute—whether an accident was the cause of Mrs. Heighley's death—which precludes a finding of summary judgment. The court finds that Plaintiff has submitted evidence sufficient for a reasonable trier of fact to find that Mrs. Heighley's death was "accidental," in that it could be found that she did not reasonably expect to die from entering the hospital for a biopsy. This view is supported by the testimony of Dr. Mogul, Mrs. Heighley's internist, that prior to the biopsy, he found Mrs. Heighley to be in good health (obviously with the exception of the cancer that was diagnosed), and cleared her for surgery. Moss Decl., Ex. 6

(Mogul Dep.) 63:19–64–10, 66:4–8. Dr. Mogul also testified that throughout his medical career, he had never seen respiratory arrest nine days following a lung biopsy as a result of the procedure. Moss Decl., Ex. 6 (Mogul Decl.), 71:24–72:16.[13] Morever, even applying the *Khatchatrian* test, there is evidence that Mrs. Heighley's death was proximately caused by an event or occurrence "unforseen and external to the insured," namely the accidental administration of a solution into her epidural catheter. Moss. Decl., Ex. 6 (Dr. Mogul Dep.) 57:8–23; Moss Decl., Ex. 8 (Dr. Fakhrai Operative Report, procedure date 4/17/97); *Khatchatrian*, 198 F.Supp.2d at 1162. Accordingly, the court denies Defendants' motion for summary adjudication of Plaintiff's breach of contract claim.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants contend that California Code of Civil Procedure section 339, which provides a two-year limitations period for bad faith claims, governs the action. Mot., p. 18. In contrast, Plaintiff relies on policy provisions for filing a claim and "taking actions on the policy." Opp., p. 21.[14] Plaintiff asserts that under the policy, a claimant must file a proof of loss "as soon as possible," and thereafter has three years within which to file a legal action "to recover on the policy." *Id.; see also* Costa Decl., Ex. B, p. 7.[15]

---

authority to check the accident box. Mot., p. 13; Reply, p. 5. Defendants acknowledge that only the Medical Examiner can check this box, but point out that the case was not referred to the Medical Examiner's office. Reply, p. 5. Defendants assert that pursuant to California Health & Safety Code sections 102850, 102855, and 102860, the Medical Examiner's office is required to investigate deaths that follow an injury or accident. Plaintiff's expert, Dr. Richard Mason, chief medical examiner for the County of Santa Cruz, states that in his opinion the case should have been referred. Mason Decl. ¶ 11.

13. Defendants do not dispute that Mrs. Heighley underwent respiratory arrest on

April 13, 1997. Moss Decl., Ex. 12, p. 4 (Response to Interrogatory No. 23). They merely dispute that this occurred as the result of an accidental infusion of medication.

14. Plaintiff does not argue that Defendants waived the applicable statute of limitations, and there is no evidence before the court that any waiver occurred. Indeed, in denying Plaintiff's claim, Defendants' letter of August 18, 1998 stated that "our denial should not be considered a waiver of any other Company defenses." Costa Decl., Ex. M, p. 2.

15. The parties do not dispute that the statute of limitations on a contract claim is four years.

 The statute of limitations in insurance litigation depends upon the nature of the cause of action asserted. *See Richardson v. Allstate Ins. Co.*, 117 Cal. App.3d 8, 11, 172 Cal.Rptr. 423 (1981). In *Richardson,* the plaintiff brought an action for breach of the implied covenant based on the defendant automobile insurance company's refusal to pay expenses incurred as a result of an automobile accident. In determining the appropriate limitations period, the court reasoned:

> Breach of the implied covenant of good faith is actionable because such conduct causes financial loss to the insured, and it is the financial loss or risk of financial loss which defines the cause of action.... We are satisfied[,] accordingly, that a tort action against an insurer for bad faith is subject to the two-year limitations period of section 339, subdivision 1.

*Id.,* 117 Cal.App.3d at 13, 172 Cal.Rptr. 423. The *Richardson* rule is regarded as the general rule in California for the limitations period governing bad faith actions against insurance companies. *See, Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 1143, 271 Cal.Rptr. 246 (1990) (to the extent plaintiffs seek tort remedies on their claim for breach of the covenant of good faith and fair dealing, the claim is governed under and is barred by the two-year statute of limitations under section 339); *see also Smyth v. USAA Prop. & Cas. Ins. Co.,* 5 Cal.App.4th 1470, 7 Cal.Rptr.2d 694 (1992).[16] The statute of limitations commences when a party knows or should know the facts essential to the claim.

*Love,* 221 Cal.App.3d at 1143, 271 Cal. Rptr. 246. Moreover, it is clear that because a policy provision limiting the time in which to bring an action is not itself a statute of limitations, it does not determine when the action accrues for purposes of the applicable statute of limitations. *Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program,* 222 F.3d 643, 649 (9th Cir.2000) (en banc); Rutter's § 12:1105.2.

 JCPenney Life sent Plaintiff a letter denying his claim on August 18, 1998. Costa Decl. ¶ 22, Ex. M. Plaintiff argues that this letter "equivocated the denial" because it invited him to submit further information. Opp., p. 22. However, it is well-established in California that an invitation to provide further information does not render a denial equivocal. *Migliore v. Mid–Century Insurance Co.,* 97 Cal. App.4th 592, 596, 118 Cal.Rptr.2d 548 (2002) (citing *Singh v. Allstate Ins. Co.,* 63 Cal.App.4th 135, 147–48, 73 Cal.Rptr.2d 546 (1998)).[17] "It merely suggests that [the insurer] is willing to reconsider its denial upon receipt of further pertinent information." *Id.* As the court construes the August 18, 1998 letter from JCPenney Life as denial of Plaintiff's claim, Plaintiff had until August 18, 2000 to bring his bad faith claim. Nearly a year later, on August 7, 2001, Plaintiff filed his Complaint. Accordingly, Plaintiff's bad faith claim is barred by the applicable two-year statute of limitations.

 The policy provisions do not save Plaintiff's claim.[18] In an *en banc* decision, the Ninth Circuit recently held

---

**16.** Plaintiff's Complaint alleges tortious conduct and seeks the tort remedy of punitive damages for his bad faith claim. Compl. ¶¶ 15, 18, 23.

**17.** Plaintiff contends that a letter sent November 2, 1999 was the "final denial." Opp., p. 22. However, that letter, in which JCPenney Life reiterated its denial, also invited Plaintiff to submit additional information. Costa Decl., Ex. O.

**18.** Plaintiff's argument that Defendants violated Title 10 of the California Code of Regulations, § 2695.4(a) is also unavailing. This subdivision provides that "Every insurer shall disclose to a first party claimant or beneficiary, all benefits, coverage, time limits, or other provisions of any insurance policy issued by the insurer that may apply to the claim presented by the claimant." Section 2695.4(a) requires only that an insurer give a claimant

that "policy provisions that arise out of application of Section 10350.11[are] *contractual* limitations periods which operate distinct and apart from the *statutory* limitations period set by the state legislature." *Wetzel*, 222 F.3d at 648 (emphasis in original); *see also* Rutter's § 12:1105.1.[19] In other words, "although Section 10350.11 performs much the same functions as would a statute of limitations, it is not itself a statute of limitations." *Id.* Rather than creating a statutory limitations period, section 10350.11 creates an additional contractual period with which insureds must also comply in order to recover for an action on the policy. *See id.* at 648; Rutter's § 12:1105.2.

▮▮▮▮ In *Wetzel,* the Ninth Circuit determined that the plaintiff's action was not barred by the four-year statute of limitations; therefore the next inquiry was whether his action was contractually barred by the three-year limitations provision in the policy. The court is convinced that *Wetzel's* holding applies whether the applicable statute of limitations is longer or shorter, as here, than the policy provision. Where the contractual provision is more restrictive than the statute of limitations, the insured must comply with both. Compliance with the contractual provision will not save a claim, however, where the statute of limitations has already expired. This determination is supported by *Flynn v. Paul Revere Insurance Group,* 2 Fed. Appx. 885 (9th Cir.2001), in which the

Ninth Circuit applied *Wetzel* and found the plaintiff's claim for tortious breach of the duty of good faith and fair dealing to be subject to the two-year statute of limitations provided by California Code of Civil Procedure section 339 rather than the three-year policy provision mandated by section 10350.11.

▮▮▮▮ As the court has found that Plaintiff's action is barred by the two-year period set forth in California Civil Procedure Code section 339, the court need determine whether Plaintiff also complied with the policy provision. Because Plaintiff's claim for breach of the covenant of good faith and fair dealing is barred by the applicable statute of limitations, the court grants Defendants summary adjudication of this claim.[20]

### 4. Negligence

▮▮▮▮ Defendants contend that a claim of negligence against an insurance company is improper because the standard for tort liability against an insurance company is bad faith, not negligence. Mot., p. 21 (citing *Brown v. Guarantee Ins. Co.,* 155 Cal.App.2d 679, 688–89, 319 P.2d 69 (1957)); *Soto v. Royal Globe Ins. Co.,* 184 Cal.App.3d 420, 434, 229 Cal.Rptr. 192 (1986). Defendants argue, and Plaintiff does not dispute, that as Plaintiff improperly attempts to replead his bad faith claim as a negligence claim, JCPenney Life is entitled to summary adjudication of this claim.[21] Even were Plaintiff to argue that

---

notice of policy provisions limiting the time to file a claim in order to subsequently assert such time limit as a bar to the action. *See Spray, Gould & Bowers v. Associated Int'l Ins. Co.,* 71 Cal.App.4th 1260, 1269, 84 Cal. Rptr.2d 552 (1999). Defendants here do not assert that Plaintiff's claim is barred by the policy provisions.

19. As noted above, the Legal Actions provision in the policy at issue is mandated by Cal. Ins.Code § 10350.11. *See* discussion at 8, *supra.*

20. Because the court has found this claim barred by the statute of limitations, it need not address other grounds raised by Defendants for summary adjudication of this claim.

21. It appears that a negligence cause of action may in certain circumstances be brought against an insurer based on the insurer's breach of duty. Rutter's §§ 11:205, 15:111; *Sanchez v. Lindsey Morden Claims Services, Inc.,* 72 Cal.App.4th 249, 254, 84 Cal.Rptr.2d 799 (1999). In *Sanchez,* however, the court noted that "negligence is not among the theo-

his negligence claim is proper, this argument would be unavailing as Plaintiff's negligence claim, like his bad faith claim, is barred by the two-year statute of limitations set forth in California Code of Civil Procedure section 339. Rutter's § 12:1136 (citing *Butcher v. Truck Ins. Exch.*, 77 Cal.App.4th 1442, 1468, 92 Cal.Rptr.2d 521 (2000)). As discussed above, Plaintiff's Complaint was filed August 7, 2001, nearly three years after his claim was denied. Accordingly, the court grants Defendants summary adjudication of Plaintiff's negligence claim.

### 5. *Violation of Bus. & Prof.Code §§ 17200 and 17500*

■ Plaintiff's Complaint alleges violations of Business & Professions Code sections 17200 and 17500. The Unfair Competition Act ("UCA") prohibits "unfair competition" and defines this term to include "any unlawful, unfair or fraudulent business act or practice." *See* Bus. & Prof.Code § 17200.[22] "Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not unlawful and vice versa." *Schnall v. Hertz Corp.*, 78 Cal.App.4th 1144, 1153, 93 Cal.Rptr.2d 439 (2000).

■ While Plaintiff's Complaint does not allege which specific prong of section 17200 Defendants purportedly violated, his argument addresses the doctrines of "unfairness" and "fraud." Opp., p. 23. He does not allege that Defendants violated a law. Whether a business practice is unfair may be determined by asking whether the unfair business practice "offends an established public policy or ... is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," or by "weigh[ing] the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Walker v. Countrywide Home Loans, Inc.*, 98 Cal.App.4th 1158, 1170, 121 Cal.Rptr.2d 79 (2002); *Shvarts v. Budget*, 81 Cal.App.4th 1153, 1158, 97 Cal.Rptr.2d 722 (2000).

■ "The 'fraud' prong of the UCA is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived." *Hyman Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 647–48, 58 Cal.Rptr.2d 89 (1996) (citing *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 211, 197 Cal.Rptr. 783, 673 P.2d 660 (1983); *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal.App.4th 1093, 1105, 53 Cal.Rptr.2d 229 (1996)).

■ Allegations that are essential to plead a claim for violation of the UCA are: (1) plaintiff's status as an insured or intended beneficiary of the insurance policy, (2) the existence of the policy, (3) the insurer's conduct and that such conduct was an unfair, unlawful or fraudulent business practice in violation of Bus. & Prof. Code § 17200, (4) plaintiff has no adequate remedy at law, (5) a request for injunctive relief and or restitution (monetary damages are not recoverable under the UCA), and (6) a request for attorney's fees. Rutter's § 15:126. Plaintiff has failed to al-

---

ries of recovery generally available against *insurers." Id.* at 254, 84 Cal.Rptr.2d 799 (emphasis in original) (citations omitted).

**22.** Section 17200 includes among its prohibited activities the acts set forth in section 17500. The parties' arguments focus on section 17200 and do not separately address section 17500, which prohibits false advertising.

lege that he has no adequate remedy at law, and has failed to request injunctive relief or restitution. Accordingly, the court finds that Plaintiff has failed to properly allege claims for relief under sections 17200 and 17500.

■ Even were Plaintiff's claims properly alleged, they would fail. Plaintiff's Complaint alleges, as to both his section 17200 and section 17500 claims, that his mother was misled by the JCPenney Life policy provisions into believing that she had purchased insurance covering accidental death and, to the extent she was wrong, she was misled. These claims are fundamentally at odds with Plaintiff's breach of contract claim and this court's decision to deny Defendants summary judgment as to this claim. The gravamen of Plaintiff's breach of contract claim is that his mother *was* covered by the policy; the court has determined that a jury could so find. Moreover, Plaintiff offers no admissible evidence that his mother—or members of the public—either were deceived, or were likely to be deceived by the purported misleading statements. To the extent Plaintiff relies upon the declarations of Plaintiff's attorney, Mr. Moss, and another attorney, Samuel Barnum, to address the Unfair Business Practices claims, those declarations are improper and are stricken.[23]

■ Plaintiff's Complaint also alleges that JCPenney Life and its agents engaged in misleading statements, as well as representations in "their circulations and solicitation materials" that induced Mrs. Heighley to purchase her insurance policy. Compl. ¶¶ 31, 36. To survive summary judgment under the Business and Professions Code, the plaintiff must prove that defendants' statements are misleading to a reasonable consumer. *Haskell v. Time, Inc.*, 965 F.Supp. 1398, 1406 (E.D.Cal.1997) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995)) (finding false advertising claim under California Unfair Business Practices Act analogous to claim under Lanham Act and applying reasonable consumer test to false advertising claim involving sweepstakes promotions). "Under the reasonable consumer standard, plaintiff is required to show not simply that the defendants' [materials] could mislead the public, but that they were likely to mislead the public." *Id.* at 1406–07 (citing *Southwest Sunsites. Inc. v. F.T.C.*, 785 F.2d 1431, 1436 (9th Cir.1986)). "Furthermore, anecdotal evidence alone is insufficient to prove that the public is likely to be misled." *Id.* at 1407 (citing *William H. Morris Co. v. Group W. Inc.*, 66 F.3d 255, 258 (9th Cir.1995)) (per curiam) (plaintiff failed to meet its burden of demonstrating that a "significant portion" of recipients were misled by the defendant's letter because plaintiff's evidence consisted solely of the testimony of two of 300 recipients that they were confused).

■ To prevail, a plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers.

---

**23.** The court grants Defendants' request that the Barnum Declaration be stricken, and that paragraphs 3 through 12 of the Moss Declaration be stricken. Mr. Barnum states as his qualification that he specializes in insurance contract coverage questions and issues of bad faith. He offers his interpretations of case law and makes legal conclusions on matters of law and ultimate issues. "[M]atters of law for the court's determination" are "inappropriate subjects for expert testimony." *Aguilar v. International Longshoremen's Union Local # 10*, 966 F.2d 443, 447 (9th Cir.1992). Mr. Moss's declaration attempts to establish that JCPenney Life has engaged in a pattern and practice of misleading consumers, and is concededly based largely upon "information [Mr. Moss has] learned in prior and current litigation against these defendants ...." Moss Decl. ¶ 5. Mr. Moss's characterizations of Defendants' conduct lack proper citation to any facts in the record and are inadmissible.

*Id.* (citing *Johnson & Johnson Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297, 298 (2nd Cir.1992)); *Coca–Cola Co. v. Tropicana Products Inc.*, 690 F.2d 312, 317 (2d Cir.1982). To state a cognizable claim, a plaintiff must demonstrate that "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Id.* (citing *Merck*, 960 F.2d at 298). Plaintiff has provided no evidence that JCPenney Life's materials either misled or were likely to mislead the public. Accordingly, he has failed to meet his evidentiary burden.

 For the first time in his opposition, Plaintiff asserts that "Mrs. Heighley was obviously confused and misled about the amount of insurance she purchased, as is every other purchaser of this policy." Opp., p. 23 (citing to Moss and Barnum's declarations). *Id.* Defendants are not bound to address unpleaded issues in their motion for summary judgment. *Gafcon, Inc. v. Ponsor & Associates*, 98 Cal. App.4th 1388, 1424, 120 Cal.Rptr.2d 392 (2002) (citing *Bostrom v. County of San Bernardino*, 35 Cal.App.4th 1654, 1663–64, 42 Cal.Rptr.2d 669 (1995)) (theories properly limited to those alleged in plaintiff's complaint).

 Nonetheless, Defendants addressed this new theory and asserted that Plaintiff has provided no competent evidence that Mrs. Heighley was misled by the materials at issue, the enrollment card filled out by Mrs. Heighley and a "welcoming letter" sent to her by JCPenney Life. Reply, p. 9. Whether this new allegation is intended to support a false advertising claim under section 17500 or a claim of fraudulent conduct under 17200, the above

analysis applies. *See Churchill Village, L.L.C. v. General Electric Co.*, 169 F.Supp.2d 1119, 1130 (N.D.Cal.2000). In order to succeed on a claim of fraud, a plaintiff must assert that "members of the public are likely to be deceived" by the defendant's conduct. *Churchill Village*, 169 F.Supp.2d at 1131 (citing *Committee on Children's Television*, 35 Cal.3d 197, 214, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)); *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4th 861, 896, 85 Cal.Rptr.2d 301 (1999) (judgment in favor of defendant appropriate where plaintiff failed to provide "substantial evidentiary support that anyone was actually misled or likely to be misled"). Here, Plaintiff has offered only the anecdotal evidence contained in his own attorney's inadmissible declaration and the inadmissible declaration of another attorney containing conclusory legal opinions. He has failed to provide evidence sufficient to support either a fraudulent conduct or false advertising claim.

To the extent Plaintiff may have intended his allegations to support a claim under the "unfairness" prong of section 17200, this claim also fails for lack of admissible evidence to support it. *See Churchill Village*, 169 F.Supp.2d at 1130–31.[24] Accordingly, the court grants summary adjudication of Plaintiff's unfair business practices claims under Business & Professions Code sections 17200 and 17500.

### 6. Punitive Damages

 Plaintiff seeks punitive damages for his claim for breach of the implied covenant of good faith and fair dealing, which the court has found to be barred by the statute of limitations. Accordingly, no

---

**24.** While an insurer's breach of the implied covenant of good faith and fair dealing may constitute an unfair business practice under section 17200 (*State Farm Fire & Cas. Co. v.*

*Sup. Ct. (Allegro)*, 45 Cal.App.4th 1093, 1105, 53 Cal.Rptr.2d 229 (1996)), the court has determined that Plaintiff's implied covenant claim is barred by the statute of limitations.

claim for punitive damages survives, and the court grants Defendants summary adjudication on the issue of punitive damages.[25]

## V. CONCLUSION

For the reasons set forth above, the court GRANTS Defendants' motion for partial summary judgment with respect to Plaintiff's claims for:

(1) breach of the implied covenant of good faith and fair dealing,

(2) negligence,

(3) violation of Bus. & Prof.Code §§ 17200 and 17500.

The court also GRANTS Defendants' motion for summary adjudication on the issue of punitive damages.

The court GRANTS Defendants' motion for summary judgment on all claims against J.C. Penney Co., Inc.

The court DENIES Defendants' motion for partial summary judgment with respect to Plaintiff's claim for breach of contract.

---

**25.** Defendants assert that even if a claim remained for which Plaintiff could obtain punitive damages, Plaintiff has not demonstrated a basis for an award of such damages. Under California law, punitive or exemplary damages may be assessed only where it is proven by clear and convincing evidence that the defendant has been guilty of malice, fraud, or oppression. Mot., p. 24 (citing Cal. Civil Code § 3294; *Roberts v. Ford Aerospace &* *Comm. Corp.*, 224 Cal.App.3d 793, 801, 274 Cal.Rptr. 139 (1990)). It is doubtful that Plaintiff's conclusory allegation that "this is not the first time [JCPenney Life has] done this very same thing" (Opp., p. 25) would provide a trier of fact with sufficient basis to find by clear and convincing evidence that Defendants acted with malice, fraud or oppression.